Good morning. The first case this morning is in re the marriage of Stephen K. Renth and Nikki Renth. And Mr. Neubauer and Ms. Gomring are both present. And Mr. Neubauer, please begin with your argument when you're ready. I'm Terry Neubauer. I'm from Fairview Heights, Illinois. I represent Stephen Renth, who is a plaintiff in a dissolution case filed in St. Clair County. The case comes up on appeal for Judge Kelly, a trial judge. He had entered an order in December of 2010. And from the court's order, we bring this appeal. If I can give a little factual basis for the issues. Steve and Nikki Renth were married in 1981. They have two children. The children are all emancipated. It's not an issue concerning custody of the children. Steve currently right now is 53 years of age and Nikki is 52. During the marriage, the Renths had a business called Five Star Builders. And Five Star Builders was a residential commercial construction company. They built spec homes and they built very, very specialized homes for certain customers. Steve was the motivating force in there. He did the labor. He did all the basically the estimating. He was the day-to-day guy. And he did this for about 25 years. Nikki at the time worked at Scott Air Force Base and she was a what's called a contract employee and she had been at Scott Air Force Base for about 25 years also. When the divorce was filed in 06, they were both working. Nikki was making about $85,000 a year and Steve had a very good income from his construction business. As the court knows, the market went into the tank at that time. Steve's business basically shut down in 2008. At that time, Steve was diagnosed with esophageal cancer, stage four. The record will reflect that he was told that he had a few months to live at that point in time. He shut down his business completely. He had workers that were out of the labor hall. The workers were laid off. They were not rehired. He had a full-time secretary that was in the office three or four days a week doing the bookkeeping. She was laid off. His business was basically at that point in time done. He applied for Social Security, received 100% Social Security disability benefits. He's getting about $1,900 a month right now. During the period of time from 2008 when he was first diagnosed with esophageal cancer to the current date, he's had 15 surgeries, chemos and other procedures. Part of his stomach was removed and his esophagus. Steve cannot work. He can't do anything. During this period of time while the divorce was going on in 2006 and 2007, Nikki had problems with her employment. Being a contract employee with the federal government, to be terminated, as the court knows, you have to go through many, many steps. They have to give you notices and you have hearings and you have appeals. Nikki was subsequently discharged in January of 2009 from the federal government as a contract employee. At that time she was making $85,000 a year. She had a TSP thrift savings plan and she had her federal employee's retirement system. During that period of time, she had three DUIs, pled guilty to all three DUIs, which certainly caused a irrevocable breakdown in the marriage. We raised before this court certain issues I think that are relevant that the trial court should have addressed in its order. The first being the distribution of assets. The rents throughout the years have acquired substantial assets to the tune of about $1.2 million. And this was real estate, cash assets, and other retirement accounts. Judge Kelly in the trial court's order basically stated all these assets and where they were to go and who was to get what. Judge Kelly awarded to the wife $638,000 in assets. Judge Kelly awarded to the husband, Steve Renth, $561,000. Now at this point in time it's important to note that, and I understand the law being that the court shall equitably divide the property as opposed to equally divide the property. The parties had a tacit agreement, and I'm going to kind of go back to day one. When the divorce was filed, they had a marital residence. It was built by Mr. Renth and it was sold subsequently to a third-party purchaser for $264,000. The Renths agreed that they would take this $264,000, which was the net proceeds, and divide it 50-50. Part of the assets was to pay off a car for a child for Mrs. Renth, and other than that the parties divided it equally 50-50. Throughout their relationship in this divorce, tax return would come in, they would divide it. It was a 50-50 split. If the court reads the appellee's brief, they talk about a fair and equal division. That's what the parties were operating under because we didn't have any children. Even though we talked about maintenance, maintenance is really not an issue in this particular case. She's not employed, he's not employed. So when Judge Kelly made his order, giving her $638,000 and Mr. Renth $561,000, there's a swing of about $76,000. If we equalize that factor, it's only basically a swing to Mrs. Renth of about $38,000. Nothing really that significant in $1.2 million. However, the court did hear evidence about advancements to the wife, which I think is important, and dissipation. And what the court heard was, and it was uncontroverted, that Mrs. Renth had three DUIs, had two lawyers, had fines, attorney's fees to the tune of a minimum of $5,000. That she could not verify withdrawals of certain accounts, what the uses were for her, marital versus non-marital. And she withdrew sums of $5,000, $45,000, $5,000, $1,000, $2,000, $10,000. In the interim, her car was wrecked. She got a check for $23,000. We argued to the trial court that she had the use and benefit of all of this money, and that on its own was dissipation, which totaled $86,000. Now, we used the premise that parties were under, that is, they were dividing the property equally. At that point in time, then we would add that back in at $43,000. Now, Mr. Renth is short $81,000. That's not that significant. But now we go to advancements. We have court orders that's in the record. August 19th of 2009, Judge Kelly gave to Mrs. Renth $75,000 as an advancement. It's in the record. July 29th, 2009, $6,000 in the record as an advancement. July 16th, 2010, $16,500 as an advancement. Those sums are $97,500. If you add that back in, which you should add back in because that's her advancement, she's now got a swing of $178,000 to her. Now, at this point in time, that's a pretty significant amount. But the brief basically indicates one other matter, and that is that when we divided these properties, monies from the sale of Merrill Residences, $264,000, Mr. Renth kept most of his money. He didn't go out and squander it. He kept it. In fact, the matter is, the brief will show that he put his money in two accounts. One account, a farmer's and merchant's account, $42,000. That's his money. A citizen's CD, $28,000. That's his money. And he bought a motorcycle for $21,000. That's his money. Total of that is $91,000. Judge Kelly, in the trial court order, did not give Mr. Renth credit for that. What he did was he counted that in the Merrill funds. In other words, he double dipped on it. So if you add back that in with her $178,000, she's already ahead of the game. Now she's ahead $270,000. You can see how the number's going up. A dispute in the trial court was as to the valuation of certain assets. And one particular asset was the valuation of the Merrill home. I had appraised the Merrill home in 2007, 2008. And on the eve of the divorce, I had the Merrill home reappraised again. And the reason I had three appraisals was because the market was going down all the time and I couldn't hit a moving target. So we had an appraiser come in and he subsequently gave a number that the value of the house was $275,000. Mr. Renth, being a contractor for 25 years, he would have disagreed with his own appraiser saying, I think it's worth $250,000. I don't think I can get it today. The house is on seven acres. It's in a flood plain. If it rains one or two inches, it floods out. You can't get a buyer for it. You can't get insurance for it. You can't get a mortgage on the property. And that was taken into account. The defendant, Nikki Renth's expert, comes in in 2007 and says this house is worth $375,000. No subsequent reappraisals because of market conditions. And she says that's what the house is worth. So I've got a swing right now of between $275,000 and $375,000, about a $100,000 swing. Judge Kelly, in his order, came up with a number of $336,000. There was no evidence to that effect at all. Our evidence was we had an appraiser up there three times. We had comparables. We had property that was situated in time and that the court just took a wrong number. It's our position that if the property should have been appraised for $275,000, there would be another swing. And that swing would be about $61,000. That's the difference. Lastly, an expert testified allegedly for the defendant saying that the business of Five Star Builders was worth $20,000. If the court reviews the transcript in the order, Judge Kelly, in his order, says we have tangible personal property that should be divided that's in the business. And he says parties should see if they can agree within a 30-day period. If they can't agree, property is to be sold. So the court took into consideration what the tangible personal property was. He had tax returns. He knew what the depreciable value of those items were. And then Judge Kelly, in his order, says, oh, by the way, I'm going to give a value of $20,000 for this business. This business is only alive so that if creditors file a lawsuit against a corporate entity, we've got a hollow shell. There's nothing there other than these assets. There was no evidence as to cash flow, income, nothing whatsoever. And it's our position that the court overstepped its bounds when the court said, well, you've got a business that's not operating since 2008, no employees, no basically work in progress, and it's worth $20,000. Our position is that Steve, that was on his side of the board. He basically had to pay that to her, $20,000, but he didn't get anything. If you take all these numbers together, the swing is about $350,000. I mean, we started out real easy with about a $38,000 swing. But you add back in what we believe is the dissipation that the court didn't consider. You add back in the advancements that's in the court order. It says right here, he gets these monies back. And the court didn't do that. So we would ask the court for an order to remand the case to the trial court to reevaluate these assets because I just think that it's totally, totally an abuse of discretion. When the court made findings as to evaluations, certainly those findings were against the manifest weight of the evidence. There was no evidence. My reply brief shows that there was speculation on the part of the expert when I cross-examined the expert. I gave different scenarios, and the expert had said at that point in time, well, yeah, if I would have known this, then the numbers would be skewed. Those were the terms, skewed. So I would ask the court to remand upon those conditions. Thank you. Thank you, Your Honor. Ms. Gomery, when you're ready, please begin. Thank you, Judge. Good morning, Your Honors. I want to briefly touch on each of the issues that Mr. Neubauer brought up today before I, I guess, go through the points raised in the brief specifically. The first point that he made was that they had a tacit agreement that was really a central theme to his brief. I think there are two different agreements that he's referring to, one being an agreement that he refers to in his brief regarding an argument, I'm sorry, an agreement regarding the marital property. The tacit agreement that he raised, his first point here today, I think he refers to the division of tax returns that were 50-50 and quail point property, which was a prior marital home that had not sold when the two, when the divorce was filed. I would agree that there was a tacit agreement with regard to how the quail point assets were to be divided and that the tax returns would be divided 50-50. And actually in the court's order, the tax return, one of the tax returns that they disputed was $10,000 and there was just, there's just no dispute that each of them got $5,000. There, the quail point assets were divided between the parties kind of by themselves without attorney involvement from what I understand. And how the court saw, how the court viewed those assets in his order doesn't necessarily mean that there was double dipping. He may have addressed the issue of those assets by saying that this person gets to keep this and this person gets to keep this, but it didn't mean that he didn't alter or take into account those assets when dividing assets that had not been divided. The fact is, is that those assets were marital assets, so they at least had to be addressed in the court order. But the mere fact that he addressed the assets doesn't mean that those, that those assets were being credited to those parties in the ultimate division of the marital property. In the brief, the plaintiff has said that there is this overwhelming agreement as to almost all the marital assets, and there's just no evidence of that. There's no record citation. There's not one page of transcript testimony that you can point to where either of the parties have said, yes, we agreed about these, the way that these assets would be divided. It just simply isn't there. And so to say that the court erred in dividing against the wishes of the parties, I find it hard to believe that Judge Kelly would know what the agreement was when no one testified to any agreement. The second point that he raised here today was that maintenance was not an issue. I do believe that that is a point on appeal that he has raised. Number one, that the court erred, and number two, that it should be reserved. First of all, I think that he's conceded the point that maintenance is not now an issue. But also, first of all, he raised an issue that Nikki shouldn't get maintenance, but the fact is that she didn't get maintenance, so it's not an allegation of error. And to say that maintenance should be reserved, I think you would have to make that motion below, and that just simply was not done. There was an allegation regarding withdrawals that Nikki made, and I think if you go through the court's order, although the reimbursement specifically pre-trial that Steve sought were denied, those motions to be reimbursed were denied, that was taken into account when the assets were divided. The fact is that there was evidence that Steve hid quite a bit of money. He came to trial with a check for, I believe, $9,600 on the day of trial, saying that these are assets from, I believe, Quail Point, and that they should have been given to Nikki. And it was interesting because Susie O'Malley was the CPA that Nikki had brought as her expert. There was no contradicting expert, and it was known to Steve that she had found these monies on the eve of trial. So I think that the court did take that into account when dividing all the assets, including the assets regarding the business that he had sole access to. And when I say the assets of the business, I mean the monies that the five-star business, I'm sorry, five-star builders, the money, those accounts that held the money from the business. With regard to the second marital home in which Steve now resides, Ivan Grove, I believe that the court split the difference. There were two experts there. There were two appraisals done, and certainly, you know, I believe that there was a good basis really for each of the appraisals. I believe that the court split the difference there. If you look at, I believe it's 275 and 375, he came down right in the middle there on what the property was worth. I think that's within the court's discretion to do that, and it wasn't against the manifest way of the evidence or in a recent discretion for him to have done that. With regard to the valuation of five-star, there just simply was no evidence that contradicted what Nikki's expert said regarding the business. Certainly, I believe the court did discount the value she placed on it. But, you know, the fact is that it was Steve and Nikki's testimony alone that other than Mrs. O'Malley of the CPA, it was their testimony alone that provided the basis for the five-star builder's valuation. So I think that the court took all that into account and, you know, came up with a number that, although it was lower than what Nikki's expert had placed on the business, the fact is there was testimony that there's equipment still relating to five-star. Certainly, there could be some goodwill attached to the five-star builder's name, and the court took that into account in valuing the business. One thing I would like to touch on also is, I think if you'll flip through the appellate's brief several times, there is a chart that is placed in the back section, I believe in the appendix, and there's just no citations to support the chart. It's against the Supreme Court rules to at least advance that as a fact or evidence in the case. It's simply a summary of what Steve wishes would have happened. There's no citations in the brief to support it, so I believe it should be stricken and not considered by the court. At the very least, it should be considered argument. It's simply not how the assets were divided by the court. It's what Steve wishes would have happened, and there's just no factual basis. If Steve would have put citations to the records to support this division, then that would be one thing, but there's just simply no record citations to support it. Also, I'd like to point out that in their brief at page 24, the appellate admits, contrary to many assertions throughout the brief, that there was no agreement as to the property division between the parties. The fact is, there wasn't. If there was, it would have come out during trial. There are several bank accounts, and there were significant assets. There were several bank accounts with monies in them that were joint accounts when the parties were married. I believe I covered that in my brief. If you have any specific questions, I'd be happy to answer them for you. With regard to the couple's retirement accounts, each was awarded their own accounts, but again, it didn't mean that the judge didn't take that into account when he divided the assets at the end of the day. So I think if you look at the judge's order as a whole, the mere fact that he mentioned the assets and awarded it to a certain party doesn't mean that it wasn't subtracted or taken into account at the ultimate division of the property. With regard to any dissipation, in his brief, and I don't know if he raised it here today, but Steve alleges that Nicky had a gambling problem. And there's one incident that he testified to at trial regarding the fact that he found on the tax return a $6,000 gain that I believe Nicky had won at one of the local gambling booths. She explained that she won it. It was during a period of time. It was 2003-2004, I believe she testified. There's no evidence that the marriage was breaking down at that period of time. I don't believe, therefore, it could be dissipation. The fact is it was a win. The fact that there was a win of that amount, absent any other evidence that she was a frequent gambler, does not make one either a gambling addict or have a gambling problem. Steve filed for divorce in 2007, so I think it's marked for dissipation. There were certain other withdrawals that were smaller in amount, but there was one that was $45,000, and Nicky did testify. Although the couple, it was a contentious divorce, they did, and they do, talk. He helped her find a house. He advised her as to what to put down on the house. The $45,000 that was withdrawn was for the down payment on that house that Steve was aware of. He advised her on the house, the Hackberry house where she lives now, and advised her what bid to make on the house. And that was taken into account in the ultimate division as well. The fact is Steve stays at the Merrill home, it's paid off, there's no mortgage, and Nicky has living expenses, but this is not considered dissipation if it's reasonable living expenses. There was also $1,000 for a Florida trip, where Steve actually gave her the money for this Florida trip. But that was, you know, obviously it was with Steve's consent. Steve went out on a trip, boarded a skiing trip to South Dakota. I don't think that's dissipation either. There were some house payments, money for house payments that he had loaned her. Again, I believe those are living expenses. There's issue made with regard to $23,000 in insurance proceeds with regard to a wrecked vehicle her son had totaled her, I believe it was an Acura, and she got $23,000 in insurance proceeds. Those were used to pay bills, and they were living expenses as well. There was an issue regarding a boyfriend and how much money was spent on this boyfriend. I think the number that was floated was $10,000 spent on this boyfriend for various things. The fact was Steve has a girlfriend. There was equal evidence that he had spent money on her, her children, her grandchildren. So I think that ultimately the court believed it was a wash. Nikki also testified that she got most of the money back from the boyfriend. The DUI expenses, Nikki, there was testimony that Nikki paid for her lawyer fees and court fees regarding these DUIs out of her own wages. She did borrow money from Steve. She paid him back. She borrowed money from her mother. She paid her back. The fact is, Nikki, I believe the second DUI she obtained was two or three days after the divorce was filed. I don't think that there's a dispute that that was an issue for her, and I believe that these expenses, though, you can tell where they had come from. The appellant also raises a point of appeal regarding Susie O'Malley's expert testimony and the quality of that testimony. The fact is that there was no objection made at trial. Steve had no rebuttal expert testimony, and I believe that that point should also be denied. There's also, I believe, one of the last points that was made was regarding their daughter Tori's 529 account. You know, there are various reasons, I guess, put forward by Steve that she's not a suitable custodian of that account, but the fact is that there is a record citation at page 230 where Steve agreed that because of his poor health that Nikki's always taking care of the account and that she would be a proper custodian for the account. I believe I've touched on most of the things that I'd like to talk about to you today. The fact is that the court divided the assets according to the evidence presented at trial. I understand that Steve is not happy about that, but he can't point to anything in the record that contradicts what the court has done, and I ask you to affirm the court's decision for that. Thank you. Mr. Neubauer, let me ask you on appendix page 24, you've got a chart, and now that was not part of the trial court record. That was prepared in preparation for appeal. It's a plot of matters that had taken place basically for the court's benefit here. But there is a point she makes that there's no citation to the record on these agreements that you make reference to in your brief and in this chart, and in looking at, you know, it doesn't appear there are. Well, I agree, Your Honor. I mean, I think that specifically, I don't think we put it in the record as to the exact wants, but there's no doubt that the transcript had shown basically that these particular items were discussed. They were in the trial before the court. As an agreement? No, as not an agreement. Absolutely, it's not an agreement. Okay. Well, that's because you've got the chart. Nikki and Steve agreed, and it's given the impression the court just ignored the agreement. Right, and I think that's a de novo matter for the court, whether there was an agreement or not. So you're saying there was a binding agreement that the court should have honored? I'm saying, Your Honor, that these people from day one acted that there was an agreement, that we had made divisions. There was nothing I have to tell the court. But when you go to court and there's some controversy over any item, aren't all bets off, essentially? Oh, I think that, I mean, the law is very clear, like I said. It's what's fair and equitable. It's not equal, and I acknowledge that, okay? But when the court takes a look at how these assets are divided, if you use that standard of equitable, we still didn't even get to equitable standards, Judge. That's the whole situation. We don't get there. But you kind of segued away from what these agreements were and how that factors into what the court should have decided. I think that we presumed during these whole proceedings, and I think that Mrs. Renth presumed during these proceedings, that we were going to divide these assets equally. And I think that if you take a look at their brief, they, on page 21 of their brief, they say that the court's decision in ruling resulted in a fair and equal division of the property. That's what they say, equal in their brief. And that's what the parties were under that awesomeness. It doesn't appear anybody told Judge Kelly that. No. I mean, a trial judge in a family case, the last thing they want to do is figure out something that's already agreed on. I mean, you know, if that's the part about it that had me troubled, to be honest with you, because, you know, Judge Kelly is not going to go back over a case to try to figure out something you've already agreed on. That's exactly right, Your Honor. Okay. If I could just address a couple of minor points. Counsel says that the assets were taken into account. And our position is, if they were taken into account, be they equal division or equitable division, how do we have such a large, large disparity between how the court made the awards of the assets? It can't be equitable at that point in time. Mrs. Renth's got $178,000 in her TSP. Mrs. Renth's got $150,000, according to their expert, in her FERS. Steve Renth has $311 per month on retirement. That's not fair and equitable. So, I mean, I think when they say that the court has taken this into consideration, I think those numbers are all skewed, Judge. Okay. Thank you. Thanks, both of you, for your arguments and your briefs. We'll get to an order as early as possible.